Richard MRAD, Plaintiff-Appellant,

v.

MISSOURI EDISON CO., and
Southwestern Bell Telephone Co.,
Defendants-Respondents.

Nos. 43234, 43257 and 43342.

Missouri Court of Appeals,
Eastern District,
Division 5.

March 15, 1983.

Motion for Rehearing/Transfer to
Supreme Court Denied
April 15, 1983.

Application to Transfer Denied
May 31, 1983.

Godfrey P. Padberg, St. Louis, for plaintiff-appellant.

James Virtel, George Kosta, James Daugherty, St. Louis, for defendants-respondents.

KELLY, Chief Judge.

Richard Mrad (hereinafter appellant) appeals from order of the Circuit Court of the City of St. Louis, Division No. 5, granting respondents, Missouri Edison Company and Southwestern Bell Telephone Company, a new trial following a jury award of $3,000,-000.00. Southwestern Bell Telephone Company (hereinafter Bell) also appealed from the order of the trial court denying its Motion for Judgment n.o.v. These two appeals were consolidated.

Appellant instituted this negligence action to recover damages for injuries he sustained while moving an aluminum ladder into or in close proximity to a bare uninsulated energized power line owned by Missouri Edison Company (hereinafter Missouri Edison) suspended 30 feet above the ground upon a wooden telephone pole owned by Bell.

Viewing the evidence from the standpoint favorable to the appellant, *Tellis v. Union Electric Company,* 536 S.W.2d 742, 744[1] (Mo.App.1976), the jury could have found that the appellant, an 18 year old youth, was employed as a camp counselor at the Easter Seal Society's Camp Daniel Boone in St. Charles County on July 16, 1977. He had earned superior grades while in high school. The camp for which he worked is a special facility operated for the purpose of providing physically handicapped children a typical summer camp experience and is heavily used during the summer months for this purpose. It contained approximately 40 acres of land. Open fields with adjacent wooded areas, a swimming pool, a lake, and 10 structures are on the property. These structures included a dining hall, five cabins, crafts lodge, farmhouse, log cabin, mobile home, maintenance shop, bathhouse, portable building and a small boat house. Trails wind throughout the grounds for hiking, pony riding and nature hunts. There is a ball field used, primarily for wiffelball, which adjoins the treeline containing the telephone pole where the occurrence took place. Although the camp itself has a rural appearance it is

located in a "developing area," i.e. surrounded by newer suburban neighborhoods.

A utility easement, wherein the 30 foot high utility pole on which Missouri Edison's wires were strung, is located approximately on, what was at the time the pole was erected, the southern boundary of the camp. There is also an old barbed wire fence containing two or three strands of barbed wire which ran along this old boundary line. In the early 70's a strip approximately 200 feet wide was added to the south edge of the property. There is no apparatus for climbing on the pole nor were there signs of any kind on it. It was located in a patch of scrub trees and sticker bushes three to six feet behind the barbed wire fence mentioned hereinabove.

Missouri Edison's distribution system ran along the camp's western boundary and then proceeded eastwardly along the original southern boundary line of the camp property. The primary distribution line has two wires—1 primary phase wire (7200 volts to the ground) and one neutral wire (zero voltage). Each wire is a bare number 4 aluminum conductor steel-reinforced line. At a point approximately midway along the old south boundary of the camp, between the camper cabins and the crafts lodge, a transformer steps down the voltage to 120–240 volts and a triplex service cable extends from this transformer pole to an Easter Seal Society pole located near the bathhouse. The triplex service has three wires —2 black wires which are insulated for up to 300 volts and a bare neutral or messenger wire which supports the cable. The 2 insulated wires each have a voltage of 120 volts to ground. Missouri Edison's line ends at the top of the Easter Seal Society pole situated near the bathhouse. The wires coming down this pole to the electric meter are owned by the Easter Seal Society. The only wires or equipment owned by Missouri Edison at the camp were the primary and neutral wires, the connecting apparatus used to maintain these wires on the utility poles, the transformer, the triplex wire and the electric meter. All other wires or lines or other electrical equipment in the camp proper and running from one building to

another were owned and maintained by the Easter Seal Society.

Missouri Edison's primary distribution system serving the camp is a bare-wire system and these systems are common throughout the United States because of the unavailability of insulated wire capable of carrying the voltage. Although there is available covered wire for 7200 volt service, the covering does not insulate the wire, and does not render the wire safe to touch and is treated the same as a bare conductor when it is approached by lineman. Missouri Edison's 7200 volt primary wire was 30 feet above the ground.

The facts of the occurrence for which appellant seeks damages are that in July of 1976, a baseball backstop was erected in the northeast corner of the activity field of the camp. Appellant, an 18 year old youth at the time, and Jerry Byrd, the Director of Camping for the camp, were laying out base paths at the field when appellant asked if he could attach a flag to Bell's utility pole positioned behind what was approximately left center field. Byrd knew that there was a power line on top of the pole and assumed that it was dangerous. He cautioned appellant to be careful of the wires. No one contacted Missouri Edison or Bell about appellant's intentions to mount the flag on the pole.

Following the evening meal on July 16, 1976, appellant and David Zurheide, a fellow camp employee, took a 32 foot aluminum extension ladder from the camp's maintenance shed and carried it across the activity field to the vicinity of the pole.

The barbed-wire fence which ran along the old southern boundary of the camp, mentioned hereinabove stood between the camp proper and the Bell utility poles and was approximately three to four feet from the utility pole in question. The east-west pole line that ran along the old southern boundary of the camp was filled with brush, scrub trees and sticker bushes. When appellant and Byrd had first discussed placing the flag on the pole they'd discussed removing brush from around the pole, but apparently that was not done.

After appellant and Zurheide arrived in the vicinity of the utility pole they adjusted the overlap of the 16 foot sections of the aluminum ladder to three or four rungs. They then rotated the ladder over the barbed wire fence and raised it against the pole. The ladder, at this time, was extended to approximately 28 feet. Appellant knew that there were electric wires on the top of the pole and he intended to keep the ladder away from the wires. He knew that he was raising the ladder toward the electric wires, but at no time did he look at the wires to ascertain whether they were covered or bare nor did he attempt to form any estimate as to where the top of the ladder might be in relation to the wires. He did not think that the ladder was tall enough to reach the height of the wires.

When they first started placing the ladder near the base of the pole it was only one foot from the pole. Appellant crossed the barbed wire fence, placed himself between the pole and the ladder, and attempted to move the ladder out from the pole. As he was so engaged his back was to the pole and he was facing the ladder with his hands on the ladder rails. He could not lift the ladder straight up, so he placed his left thigh against the metal rung to move it forward towards Zurheide who was standing in the field. During this process, appellant looked up and saw the top two wires and at that time it appeared to him that the ladder was below the bottom of the top two wires.

While attempting to increase the angle of the ladder with the pole, appellant heard what sounded to him like a jackhammer, and the camp lights went out momentarily.

Appellant was found lying unconscious on his stomach, the barbed wire fence beneath him and Zurheide was found lying dead in the field. The ladder had either come into direct contact with the primary line, or a flow of electricity from the line came across a contaminated ceramic insulator to the metal pole pin and then to the ladder, down the ladder and through appellant's body to the ground, or the electricity arced directly from the wire to the ladder.

Appellant sustained severe electrical burns with almost complete sensory motor loss of both wrists and hands, third degree burns of both big toes and second degree burns on his abdomen, and burns on his thigh and chest. He was also caused to undergo many painful operations including debridement and the amputation of three toes.

Appellant instituted this action against Missouri Edison and Bell and a jury awarded appellant damages against both defendants in an amount of $3,000,000.00. Both Missouri Edison and Bell filed timely motions for a Directed Verdict or, in the alternative, for a New Trial. Bell, in its motion, also included, as an alternative, a motion for judgment n.o.v.

The trial court sustained both defendants' motions for new trial on the ground that appellant's verdict director instructions failed to instruct the jury on the issue of isolation of the electric wires.

Appellant has appealed from this order granting the respondents' motion for new trial. On Bell's motion the two appeals were consolidated.

Appellant's first Point is that the trial court erred in granting the defendants a new trial on the ground that his verdict directing instructions [1] were defective and

1. *Instruction No. 3:* Your verdict must be for the plaintiff and against the defendant, Missouri Edison Company, if you believe:

First, defendant, Missouri Edison Company, maintained a bare electric wire on a pole on the Easter Seal Society property, and that this was a condition which represented an unreasonable risk to persons using the campgrounds, and

Second, defendant Missouri Edison Company, knew or by the exercise of the highest

degree of care should have known of such condition, and

Third, plaintiff did not know and by using ordinary care could not have known of this condition, and

Fourth, defendant, Missouri Edison Company, *failed to use the highest degree of care to warn* of such condition, and

Fifth, such failure either directly caused damage to plaintiff or directly combined with the

misdirected the jury in that they failed to instruct the jury on the issue of isolation of the electric wire.

Appellant's theory, as submitted in his verdict-director, was that Missouri Edison's maintenance of a bare, highly charged, electric wire on a utility pole on the Easter Seal Property, represented an unreasonable risk to persons using the campgrounds and Missouri Edison, in the exercise of the highest degree of care, should have known this and, nevertheless, failed to use the highest degree of care to warn of this condition to appellant's damage.

Missouri Edison contends the instruction is erroneous because it fails to require a factual determination that its wire was not isolated.

■ Missouri decisions recognize that while a generator and transmitter of electricity is not an insurer of the safety of all persons, it is nonetheless required to use the highest degree of care to prevent injury which it could anticipate, even though it did not anticipate the exact injury which occurred or the exact manner in which said injury occurred. *Lebow v. Missouri Public Service Company,* 270 S.W.2d 713, 715[2] (Mo.1954).

Appellant admittedly structured his Not in M.A.I. instruction in accord with the guidelines announced by this court in *Glastris v. Union Electric Company,* 542 S.W.2d 65, 71 (Mo.App.1976). The ultimate fact of negligence in *Glastris* was the utilities' negligence in maintaining a condition that was an unreasonable risk to the minor plaintiff. The verdict director submitted the electric company's failure (1) "to insulate the electric wire" or (2) "place an insulator in the guy wire," or (3) "to maintain a warning sign on the pole which would be reasonably adequate to enable young children to protect themselves from the danger, . . ." The

instruction then directed a verdict for the plaintiff if the jury believed Union Electric failed to exercise ordinary care[2] by *either* of the "evidentiary means" of failure to insulate its electric wire *or* failing to insulate its guy wire *or* failing to maintain a warning sign.

As Union Electric argued in *Glastris,* supra, Missouri Edison does here, i.e. that the verdict-director erred by omitting a finding excusing it from liability if its wires were properly isolated, because non-isolation was an essential element of appellant's case.

We held that the instruction in *Glastris,* supra, was prejudicially erroneous because the verdict-director, contrary to M.A.I. Rule 70.01(e), submitted Union Electric's liability "on the evidentiary facts of insulation, etc., rather than the *ultimate fact* of negligently maintaining a condition that was an unreasonable risk to plaintiff."

By contrast, the verdict-director in the instant case did *not* present to the jury a choice of paths toward liability, any one of which would authorize a judgment against Missouri Edison.

Unlike *Glastris,* supra, the submission did not base liability on, or even mention, "the single evidentiary fact" of Missouri Edison's failure to insulate. While it did submit the conceded fact that Missouri Edison maintained a bare electric wire on a pole on the campgrounds, it was this condition which the jury was required to find represented an unreasonable risk to persons using the campgrounds, and, coupled with Missouri Edison's knowledge of said unreasonable risk, gave rise to a duty on its part to warn persons using the campgrounds of said unreasonable risk.

To find for appellant under this submission the jury had to initially find the ultimate fact that Missouri Edison maintained

---

acts of Southwestern Bell Telephone Company or Jerry Byrd to cause damage to plaintiff, Unless you believe plaintiff is not entitled to recover by reason of Instruction No. 5. Not in M.A.I. (Emphasis added)

2. It is clear the supplier of electricity must exercise the highest degree of care. *Scaife v.*

*Kansas City Power and Light Company,* 637 S.W.2d 731, 733[3] (Mo.App.1982); *Summers v. Union Electric Company,* 565 S.W.2d 677, 680[5] (Mo.App.1978); *Tellis v. Union Electric Company,* 536 S.W.2d 742, 745[2] (Mo.App. 1976).

a condition that was an unreasonable risk for appellant and others using the campgrounds.

As we pointed out hereinbefore Missouri Edison was under a duty to either insulate *or* isolate its high voltage wire. It conceded that its wire was not insulated. If its wire was adequately isolated then the jury could not make a finding that it maintained a condition which represented an unreasonable risk to persons using the campgrounds and thereby breached the duty it owed all persons, including appellant, who used the campgrounds.

In our opinion the instruction submitted the ultimate fact of negligently maintaining a condition that was an unreasonable risk to appellant and Missouri Edison's failure to warn him of said condition.

■ Under this submission, to find an unreasonable risk the jury had to reject Missouri Edison's evidence and argument that its hot wire was adequately isolated because had the wire been properly isolated it could not constitute an unreasonable risk. To satisfy the duty to isolate, where it did not insulate, Missouri Edison, in the exercise of the highest degree of care, must have located its wire where it would not injure persons in places where the utility corporation might reasonably expect them to lawfully be. *Burk v. Missouri Power & Light Company,* 420 S.W.2d 274, 277[2] (Mo. 1967).

In argument Missouri Edison's counsel argued the isolation issue extensively, and pointed out to the jury that its wire was placed twice as high as the standard 15 feet elevation established for uninsulated wires transmitting this voltage by the National Electrical Safety Code. The jury, by its verdict, rejected this line of argument and found as a fact that Missouri Edison's wire was not adequately isolated and thus constituted an unreasonable risk to appellant and others who happened to come into its vicinity.

■ The test of foreseeability of injury in these cases is whether, in the exercise of the highest degree of care, the electric com-

pany reasonably could have anticipated that some injury was likely to have occurred to one lawfully near its transmission line. *Donovan v. Union Electric Company,* 454 S.W.2d 623, 626[6] (Mo.App.1970).

While the courts of this state have not seen fit to clothe the activities of electrical generating corporations with strict liability, where the question of foreseeability has been raised the courts have usually held the question to be one for the jury. *Burk,* supra, (man erecting aluminum T.V. antenna electrocuted); *Erbes v. Union Electric Company,* 353 S.W.2d 659, 665[2] (Mo.1962) (construction worker installing lentils on building with crane truck equipped with headache ball which he was using as a hammer in effort to straighten lentil, sustained injuries when headache ball came into contact with defendant's uninsulated wires 32 and 26 feet, respectively, above surface level); *Goddard v. St. Joseph Light & Power Company,* 379 S.W.2d 565, 569 (Mo.1964) (12 year old boy seriously burned when tree trimmer pulled limb from tree which came into contact with city's street light, which in turn came into contact with Power Company's uninsulated 7200 volt line 33 feet in the air, causing an arc, severing the line which fell to the ground and struck the boy who was sitting on the ground where it fell).

■ We hold that the trial court erred in sustaining Missouri Edison's motion for new trial on the grounds that appellant's verdict-directing Instruction No. 3 misdirected the jury.

■ Inasmuch as the granting of Bell's motion for new trial was to remove an adverse judgment against it, the denial of Bell's motion for judgment n.o.v. neither constitutes a final judgment within § 512.-020 RSMo. 1978 nor adversely affects or aggrieves it to give it standing to appeal. *Powell v. Watson,* 516 S.W.2d 51, 52[3] (Mo. App.1974). Therefore, although none of the parties has objected to this court's jurisdiction of Bell's appeal, it is our duty to notice that question ex mero motu, *Powell v. Watson,* supra, l.c. 52[2], and dismiss Bell's appeal for the reasons hereinbefore stated.

■■ This dismissal does not, however, foreclose a challenge to the submissibility of the case for appellant because this issue was preserved in Bell's after-trial motion, *Schmittzehe v. City of Cape Girardeau,* 327 S.W.2d 918, 920[1] (Mo.1959), *State ex rel. Mather v. Carnes,* 551 S.W.2d 272, 279 (Mo. App.1977), and where the record shows plaintiff cannot recover under the law and evidence, we will direct entry of judgment for defendant and spare another trial. *Bailey v. Interstate Airmotive,* 358 Mo. 1121, 219 S.W.2d 333, 336[3] (1949).

Bell contends that the ownership of the utility pole was not the proximate cause of appellant's injuries. We agree.

The utility pole in question was still in the same place it was erected in 1955, a period of almost 21 years, within an easement granted by the developer of the area, and, at that time on the boundaries of Camp Daniel Boone. Bell had not used the utility pole for its telephone business since 1970 when its telephone lines were put underground. Bell's two wires on the utility pole were not removed at that time although they were no longer being used for telephone purposes. The pole was perfectly bare with no metal steps or other climbing apparatus attached to it. It stood some three to six feet behind a barbed wire fence which separated the brush filled treeline from the play area of the camp; and was surrounded by some "scrubby" trees, "not the kind you would climb." While there was evidence that children sometime played near the base of the utility pole, there was none to the effect that any child or grownup had attempted to climb this utility pole.

Appellant concedes that Bell had no duty to insulate or isolate Missouri Edison's transmission lines and that it had no authority or control over those same lines. Nevertheless, it argues that it is the law in Missouri that an owner has a duty to warn of a dangerous electric wire on its property. The four cases he cites in support of this legal principle are inapposite. *Rose v. Missouri District Telegraph Company et al.,* 328 Mo. 1009, 43 S.W.2d 562 (Mo. banc, 1931) involved injury to an employee of one of the three utilities, Missouri District Telegraph Company, using the telephone pole owned by Southwestern Bell Telephone Company, who sustained injuries when a cross-arm owned by the third utility using the pole, the Union Electric Company, came down from the pole and caused him to fall 42 feet to the pavement below. The basis for holding that the telephone company had a duty to see that all equipment on the pole was kept in a reasonably safe condition was on the grounds that when the telephone company leased to the telegraph company space at the top of the pole, on which to maintain its brackets and wires, the telephone company was bound to know that it would be necessary for the employees of the telegraph company to climb the pole in order to repair their employer's wires, and that in so doing they would necessarily pass the cross-arms of the light company on their way up the pole; and that by leasing space on the pole to the telegraph company, knowing that the employees of that company would climb the pole, the telephone company impliedly agreed to maintain the pole in a reasonably safe condition *for climbing.* The duty of the telephone company was likened to a landlord-lessee relationship and the landlord's duty in respect to the common areas of an apartment building.

*Redman v. Earle M. Jorgenson Company,* 491 S.W.2d 304 (Mo.banc, 1973) and *McDonnell Aircraft Corporation v. Hartman-Hanks-Walsh Painting Company,* 323 S.W.2d 788 (Mo.1959) are cases involving injuries sustained by plaintiffs who came into contact with an exposed wire when they were working in an area where they had a right to be in the performance of service being rendered the defendants and which area the defendant knew to be dangerous to anyone working therein but, nonetheless, failed to warn plaintiffs of said hazardous condition.

Appellant also cites *Trout v. Laclede Gas Light Company,* 151 Mo.App. 207, 132 S.W. 58 (Mo.App.1910) for the proposition that when two companies, by agreement or otherwise, use the same pole upon which they suspend their wires they are joint owners and each company owes a duty. *Trout* too was concerned with the duty owed to employees of a user by joint users of a utility pole; it said nothing about a duty to warn the general public. The plaintiff in *Trout*

was an experienced electrical lineman engaged in transferring live wires from one pole to another and the question was whether he was guilty of contributory negligence.

*Beavers v. West Penn Power Company,* 436 F.2d 869 (3rd Cir.1971) is cited by appellant as authority for other reasons. With respect to the question under discussion, the case held that under Pennsylvania law a joint venture did not exist between an electric company and a telephone company which would permit imputing the electric company's negligence to the telephone company solely by virtue of the relationship created by an agreement by which each was given the right to use the other's poles to string its wires, where ownership · of the telephone pole remained in the telephone company as did the exclusive obligation to maintain the telephone pole. *Beavers* does not aid appellant in this case.

While we are not confronted in this case with a fact situation identical to that with which the court in *Glastris,* supra, was, the facts of the two cases are similar.

In both cases a telephone company and an electric company were involved. The telephone company, as here, owned the telephone pole upon which the electric company's 7200 volt transmission line was suspended, and, although the telephone company lines were still on this pole, they had not been in use for approximately six years. Loose wires were strewn on the ground in the vicinity of the pole, one wire dangled from the pole to the ground, and wires running along the pole line with a frayed covering and attached to cracked insulators were also visible. From what the plaintiff saw he believed all the wires were telephone lines and had been abandoned.

In *Glastris,* however, the wires of both defendants were attached to a series of 20 foot poles, and the pole in question was equipped with L-shaped climbing spikes, the lowest eight feet, eight inches above the ground. It was not established by the evidence how the youth reached the lowest climbing spike as he commenced his ascent of the pole.

With respect to the general locale of the area in which the telephone pole was erected, it was a hilly, wooded tract in St. Louis County, with a heavily populated residential area adjoining the tract. An abandoned vandalized residence was located on 68 acres of the tract, and a pre-school nursery and horse stable were located on the remaining 10 acres. The portion of the tract on which the abandoned residence was situated was partly unfenced and had been used for several years by the general public and particularly so by people of the adjoining residential areas. The tract was laced with trails and pathways, one of which ran along the pole line. The whole area was used without protest, mostly by children for such activities as hiking, horseback riding and motorbike riding, picnics, tree houses and camping.

In holding that the trial court erred in denying the telephone company's motion for a directed verdict, the court in *Glastris* said; "The evidence fails to show Southwestern Bell had reason to know of plaintiff's trespass or the probability of his being injured; hence, it did not breach a duty to plaintiff."

Albeit there are some factual distinctions in *Glastris,* we believe the principles enunciated therein are persuasive in reaching a decision in this case.

The evidence established that Bell's telephone pole was located in a lawful utility easement on the property of the camp and had been since 1955. Although it was situated in a brush filled area, it and the transmission lines on the top of the pole were clearly visible. It stood some three to six feet behind a two foot high two strand barbed wire fence that separated the brush-filled area from the large play area of the camp. Unlike the telephone pole in *Glastris,* this pole had no L-shaped climbing spikes nor other apparatus for climbing the pole. The trees around the pole were described as "quite scrubby, not the kind that you would climb." While there was evidence that children sometimes played near the pole's base, there was none to the effect that any child or grownup had at any time attempted to climb the pole. Bell had not used the pole for telephone purposes for more than six years.

Although there may be some question as to exactly how the electricity came into contact with appellant, i.e. whether the aluminum ladder he was holding came into physical contact with the high voltage line of Missouri Edison or whether the electricity arced some short distance to the ladder— appellant's theory in the trial court and here is that the electricity arced from the pole to the aluminum ladder and that the ladder never directly came into contact with Missouri Edison's wire. There was evidence that the electricity might have arced from the insulator and the pole pin; however there was no evidence that the insulator and the pole pin were installed nor maintained by Bell; nor that Bell had any control over either.

To all intents and purposes all Bell did was furnish a bare wooden utility pole and Missouri Edison installed and retained exclusive control over the transmission wire strung on the top of the pole some 30 feet above the ground.

Before a duty to warn can come into being for Bell in this case we are of the opinion that Bell would have had to have knowledge or have had reason to know of the potential danger to appellant arising from the pole on which Missouri Edison maintained its own high tension wires. While there is some evidence that those enjoying the camp facilities engaged in various activities throughout the campgrounds there is no evidence that Bell knew or had reason to know of anyone coming into close proximity with the electric wires suspended thirty feet above the ground.

Appellant's reliance on *Beavers v. West Penn Power Company,* supra, pertaining to Bell's duty to warn, is misplaced because in *Beavers* there was a dispute about whether the telephone poles on which the electric company's wire was strung were within the boundaries of the ten foot utility easement. *Beavers* had alleged that the telephone company was a trespasser since its poles leaned outside the utility easement on the property of decedent's parents, the Masons, when the fatal injuries were sustained, and there was evidence at trial that sometime after the poles were placed on the property one of them tilted so that it's top was more than two feet further into the Mason property than when originally erected. Under Pennsylvania law Bell was a trespasser unless it established that the tilt had existed for a sufficient period of time to create a prescriptive right in the position of its poles. This trespass to land issue was important because under Pennsylvania law a trespasser becomes liable for personal injuries resulting from the trespass *whether the injury was proximate or indirect* and whether the trespass resulted from an innocent mistake on the part of the trespasser.

*Beavers* did not hold a telephone company owed any duty to the decedent merely because the electric company strung its wires on the telephone company's poles. What it did hold was that under Pennsylvania law a trespasser was liable for injuries resulting from the trespass whether the injury was proximate or indirect, and the issue in that case was whether under the evidence the telephone company was a trespasser.

There is no charge nor is there any evidence raising the question whether Bell was a trespasser in this case, and even if the law were the same in Missouri as it is in Pennsylvania in this respect, the issue was not present in this case.

Foreseeability of harm or injury resulting from acts or omissions of the defendant Bell is an essential element in the determination of liability. *Donovan v. Union Electric Company,* 454 S.W.2d 623, 626[4] (Mo.App.1970); *Lebow v. Missouri Public Service Company,* 270 S.W.2d 713, 715[2] (Mo.1954). Bell cannot be held responsible for injuries caused by a high voltage wire, which as appellant concedes, it neither owned, controlled nor maintained solely because the wire was securely attached to its pole some thirty feet in the air. This is particularly so where there is no evidence that Bell knew or had reason to know that there was a probability that counselors or children at the camp would make contact with Missouri Edison's transmission wire suspended 30 feet in the air in the midst of some scrub bushes.

We do not believe, under these circumstances, that the jury could reasonably find that Bell, in the exercise of the highest degree of care, should have foreseen the reasonable likelihood that appellant would be using this area so as to make contact with Missouri Edison's electric transmission line. *Glastris,* supra 542 S.W.2d l.c. 68[2] and *Donovan v. Union Electric Company,* supra, 454 S.W.2d l.c. 626[8].

The appeal of Southwestern Bell Telephone Company is dismissed. The judgment as to Southwestern Bell Telephone Company is reversed and remanded to the trial court with directions that the trial court enter an order sustaining Southwestern Bell Telephone Company's motion for judgment notwithstanding the jury verdict and dismissing appellant's claim against said defendant. The judgment of the trial court granting Missouri Edison a new trial is reversed and the cause is remanded to the trial court with directions to set aside its order granting said defendant a new trial and to enter in lieu thereof a judgment on the jury verdict in favor of the plaintiff and against defendant Missouri Edison.

CRANDALL and DOWD, JJ., concur.